UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| UNITED STATES OF AMERICA, | ) | Case No. 3:16-cr-00035-SLG-SAO |
|---|---|---|
| | ) | Case No. 3:16-cr-00058-SLG-SAO |
| Plaintiff, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | **REGARDING DEFENSE MOTION TO** |
| | ) | **SUPPRESS PHYSICAL EVIDENCE** |
| ARNOLD WESLEY FLOWERS, II, | ) | **FROM SEARCH OF RESIDENCE** |
| | ) | |
| | ) | **Dkt. 52 in 3:16-cr-00035-SLG-SAO** |
| Defendant. | ) | **(Dkt. 58 in 3:16-cr-00058-SLG-SAO)**[1] |
| | ) | |

## Introduction

The defendant, Arnold Wesley Flowers II (Defendant), moved to suppress all evidence resulting from execution of a state of Alaska search warrant at 3108 Seclusion Bay Drive.[2] The Government opposed at Dkt. 70 (Dkt. 82) and Defendant replied at Dkt. 87 (Dkt. 98). Defendant requested an evidentiary hearing, Government opposed, and the court did not find an evidentiary hearing necessary to decide the motion.[3] The court considered proffered facts from the parties and exhibits offered in support of the motion and opposition.[4] Oral argument was held August 23, 2016.[5]

---

[1] Docket annotations in 3:16-cr-00058-SLG-SAO will appear in parentheses.

[2] Dkt. 53. (Dkt. 58).

[3] At the August 3, 2016 status hearing, the court heard argument from the parties regarding the need for an evidentiary hearing and subsequently ruled that none was required to determine this motion. Dkt. 94 (Dkt. 111), Dkt. 96 (Dkt. 119).

[4] Dkt. 134, at 90. See also August 3, 2016 status hearing. Dkt. 94 (Dkt. 111), Dkt. 96 (Dkt. 119).

[5] Dkt. 140 contains the minutes.

1

Defendant is named in two pending cases before the court. In case 3:16-cr-00035-SLG-SAO, the defendant was indicted on one count of Possession of a Controlled Substance with Intent to Distribute violating 21 U.S.C. § 841(a)(1) and (b)(1)(C), one count of Possession of a Firearm in Furtherance of Drug Trafficking violating 18 U.S.C. § 924(c)(1)(A)(i), and one count of Felon in Possession of Firearms violating 18 U.S.C. 922(g)(1) and 924(a)(2).[6] In case 3:16-cr-00058-SLG-SAO, a First Superseding Indictment named the defendant and Miranda May Flowers in fourteen counts of Wire Fraud in violation of 18 U.S.C. 1343.[7]

## Issues Presented

Defendant Flowers II was charged in part based on evidence obtained from a police search of his home at 3108 Seclusion Bay Drive in Anchorage, Alaska. An Alaska magistrate judge authorized the search in warrant No. 3AN-16-824-SW on March 24, 2016, executed on March 29, 2016.[8] Flowers II challenges the lawfulness of the warrant for 3108 Seclusion Bay Drive as well as law enforcement officers' reliance upon it.[9] This Report and Recommendation addresses the following issues:

1. Whether the evidence presented to the Alaska magistrate judge was sufficient for the magistrate to find a substantial basis that probable cause existed to search 3108 Seclusion Bay Drive on March 29, 2016.

2. If the magistrate's probable cause determination lacked substantial basis, then whether law enforcement officers' application for and reliance on the warrant was objectively reasonable under the doctrine of good faith.

## Findings of Fact

---

[6] Dkt. 2.

[7] Dkt. 132.

[8] Officers of the Anchorage Police Department led the search accompanied by other law enforcement agencies.

[9] Dkt. 52-1.

The Alaska magistrate judge made her probable cause determination based on an eighteen-page affidavit from Detective R. Allen Adair of the Anchorage Police Department (APD). The affidavit chronicles joint APD and FBI surveillance of Defendant and Davon Smith, among other individuals, between January 27, 2016, and March 26, 2016, as well as historical information predating January 27, 2016.

Detective Adair's affidavit supporting the warrant describes that he has over twenty years of law enforcement experience, including concentration in the field of drug enforcement. He completed three different law enforcement academies and conducted hundreds of drug-related investigations, including investigating the use, possession, manufacture, and trafficking of various drugs. Detective Adair also served as a drug detector dog handler. The affidavit described his detailed knowledge of the characteristics common to those involved with drugs applied it to the behaviors of Defendant and Davon Smith (Smith). Detective Adair described specific examples of behavior indicating Defendant and Smith were involved in the illegal drug trade. [10]

The investigation leading to the search warrant began when Davon Smith, who lived at Defendant's house, was observed supplying heroin to a known drug dealer. Smith was on release from the State of Alaska because of a pending drug offense. Smith resided with Defendant and his wife, Miranda May Flowers, pursuant to a court order establishing Miranda Flowers as his custodian.[11] All three lived at 5422 Larkspur until they moved, approximately March 19, 2016, to 3108 Seclusion Bay Drive also in Anchorage, Alaska. On January 27, while the defendant and

---

[10] Though described in greater detail below, Detective Adair described Defendant and Smith's counter-surveillance activities, Flowers II's very frequent visits to a storage locker at odd nighttime hours, several times carrying safes, the suspicious timing of some of Flowers II's visits to a storage facility with Smith's short-duration meetings, and the unusual behaviors of the many short-duration guests frequenting the Larkspur house.

[11] Dkt.53, at 15.

Smith resided together, Detective Adair, in an undercover capacity, placed an order for heroin with a known dealer. Police observed the dealer meet with Smith later that day. The next day, APD officers observed Smith again meet with and supply drugs to the known dealer who then sold approximately 5 grams of heroin to Detective Adair. This transaction precipitated significant additional surveillance of Smith and eventually his housemate, Defendant, including eventual issuance of state warrants to track their whereabouts via GPS and visual surveillance.

Davon Smith was observed by police regularly coming and going from a duplex at 5422/5420 Larkspur Circle.[12] APD observed three other individuals regularly coming and going from the same address: Defendant, Arnold Wesley Flowers III (Defendant's son), and Miranda Flowers. Detective Adair's query of APSIN confirmed that the Defendant's registered address was 5422 Larkspur. Based on visual observations, electronic tracking, and APSIN information, Adair concluded that all four individuals resided at 5422 Larkspur.

APD also observed Smith's girlfriend, Lismar Colome, leaving the Larkspur duplex on at least one occasion while Smith resided there with the defendant. Police were aware at the time that Colome was wanted under a federal arrest warrant after a recent indictment for possession of 185.62 grams of heroin. That heroin was allegedly found on Colome's person in September 2015 as police investigated a possible shooting in the apartment she shared with Smith. Colome allegedly attempted to depart with that heroin, and a search warrant yielded an additional 116.16 grams of heroin in their apartment, along with firearms, money, and drug paraphernalia. With regard to Defendant, Detective Adair suspected him of being involved in upper level heroin sales

---

[12] 5422/5420 Larkspur is a common Duplex with separate entrances for the two separate residences.

4

based on surveillance and information he received from witnesses and various entities, as discussed below.

On February 24, 2016, Detective Adair notes in his affidavit that he spoke with a neighbor on Larkspur Circle who described to Adair a variety of frequent, short duration vehicle and pedestrian traffic to and from 5422/5420 Larkspur. More specifically, the neighbor observed that visitors would frequently park on a nearby street, instead of Larkspur, and enter 5422 through a specific door before departing shortly thereafter. Detective Adair's affidavit states that he confirmed that specific door was that of 5422 Larkspur, the residence of the Flowers' and Smith, and that it was consistent with police observations of the foot traffic and manner of entry into the house. Adair's affidavit avers that based on his training and experience, the frequent, short duration visits and unusual manner of visitors' parking habits, indicates behavior "exercised by those involved in order to appear somewhat discreet in their endeavors and create a buffer between the drug supplier *I* drug customer relationship."[13]

On February 24, Detective Adair purchased heroin again via Smith. As before, Adair called his dealer, then Smith was observed departing his Larkspur residence before meeting with Adair's dealer. The dealer then delivered approximately 4.5 grams of heroin to Detective Adair. Later in the day, Officer Deville was confronted by the Defendant as he conducted undercover surveillance on Larkspur. Initially, Deville was parked several houses to the south of 5422 Larkspur, when the defendant arrived home and took note of him. After staying away for some twenty minutes, Officer Deville returned to the area and took up surveillance approximately four houses to the north of 5422 Larkspur this time. Only a few minutes into Deville's new location, the defendant drove his vehicle and parked in front of Deville's undercover vehicle, got out, and

---

[13] Dkt. 70, at 10.

asked Deville what he was doing there. When Deville responded that he was waiting for a real estate agent to show him a house, the Defendant seemed satisfied and departed. Detective Adair concluded that "based on Defendant's demeanor, surveillance detection abilities, apparent relationship to Smith, and relationship to 5422 Larkspur Circle ... [Defendant] was still currently engaged in upper level heroin sales."[14] Following these events, on February 26, Detective Adair obtained state search warrant number 3AN-16-559SW from Judge Dickson authorizing a search of 5422 Larkspur, however it was not served.

On March 8, Detective Adair observed two men resembling Davon Smith and Flowers III enter Best Storage, an indoor storage facility at 3521 East Tudor Road in Anchorage, Alaska. Using binoculars, Detective Adair saw the pair inside and on the fourth floor of the building; locker number 4045 is located on the same floor and was frequently visited by the Defendant. They appeared to be accessing a storage locker as they handled some objects. Thereafter, police began conducting surveillance at Best Storage in tandem with the visual and GPS surveillance of the Defendant and Smith. At this time, Storage facility cameras and warrant-authorized police cameras showed Defendant and Flowers III regularly coming and going from the Larkspur residence to Best Storage. Law enforcement observed the Defendant and Flowers III carrying large portable safes into and out of locker #4045 on at least five occasions, March 8, 19, 21, 22, and 24, 2016.

Between March 17 and March 18, 2016, Officers saw Defendant, his wife, Flowers III and Smith move from 5422 Larkspur to a new home at 3108 Seclusion Bay Drive. On March 18, Detective Adair observed Smith, the defendant, and the defendant's family at Best Storage accessing unit #3019 on the third floor of the building. Police spoke with a teenager who was

---

[14] Dkt. 70-1, at 15.

assisting the Defendant and Smith as they moved their belongings. The teenager informed Adair that he and the adults were picking up items from a storage locker with which to furnish their new home. The continuing physical and electronic surveillance of the Defendant and Smith confirmed that Defendant, his wife, Flowers III, and Smith had relocated to 3108 Seclusion Bay. Accordingly, the officers discarded the February 24 warrant for Larkspur and sought a new warrant for the defendant and Smith's new house at 3108 Seclusion Bay.

At 3:45 a.m. on March 21, the Defendant was observed accompanied by Flowers III carrying a safe to locker #4045 at Best Storage. After opening that locker, the Defendant removed a second safe from within. He then accessed both safes and removed a large bundle of cash, approximately four inches thick, from one of the safes. Defendant put that currency into a Crown Royal bag, inspected a second Crown Royal bag, placed both safes into the locker – including the safe he arrived with – then departed the complex. Later that day, Detective Adair attempted another heroin purchase from his dealer but was unsuccessful. The dealer informed Adair that Smith had become leery since the February purchase, but that Smith was in the process of resupplying his heroin cache.

On March 22, officers observed Defendant depart Best Storage and drive to 3108 Seclusion Bay Drive. Approximately five minutes after Defendant arrived home, Smith left the same house in his vehicle and drove to the Mountain View area of Anchorage where he appeared to engage in a short duration meeting with an occupant in another vehicle. Thereafter, Smith drove to three more locations in the nearby area, staying at each for between three and thirty-seven minutes, before he eventually returned to 3108 Seclusion Bay where his car remained for the night. During one of the short duration visits, a male was observed entering Smith's car for three minutes and then departing. Detective Adair stated that these behaviors were consistent with illegal drug

transactions based on his training and experience. On March 24, 2016, Detective Adair obtained state search warrant #3AN-16-824 to search the house at 3108 Seclusion Bay Drive, which was searched on March 29, 2016.

**Conclusions of Law**

a.  **The Defendant had a reasonable expectation of privacy in his home; therefore he may challenge the warrant.**

Prior to examining the lawfulness of the warrant, the court must first address Government's assertion that Defendant lacks Fourth Amendment standing[15] to challenge that warrant. More specifically, the Government's argument is that Defendant lacked a privacy interest both in his home and with regard to evidence seized from within his home, including from within his wife's purse. The court's inquiry, though, is focused on the location of the seized items and not per se on the possessory status of those items. Defendant had a reasonable expectation of privacy in his primary residence and thus in the items searched and then seized from his home, regardless of whether he or a third party owned those items. Accordingly, the court concludes that Defendant enjoys the right to challenge the warrant which precipitated the seizure of evidence from his home now used in a prosecution against him.

---

[15] The court recognizes that the Supreme Court has moved away from a Fourth Amendment "standing" analysis in favor of a substantive inquiry into the reasonableness of the challenger's expectation of privacy. *See,* United States v. $40,955.00 in U.S. Currency, 554 F.3d 752, 756 (9th Cir. 2009) ("The question of who is entitled to contest a search is often framed as one of standing. However, since the Supreme Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many traditional standing inquiries definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.") (internal quotation marks omitted) (citing Rakas v. Illinois, 439 U.S. 128, 140 (1978).); *accord* Minnesota v. Carter, 525 U.S. 83 (1998).

In the Fourth Amendment context, "only those who have a legitimate expectation of privacy in an area [may] challenge a search of it."[16] That expectation must be not only legitimate, but also "must be an actual one and one that society is prepared to recognize as reasonable."[17] The challenger bears "the burden of establishing their legitimate expectations of privacy" as a condition precedent to review of the warrant's lawfulness.[18] As especially applicable to the instant case, it is "clear that one's reasonable expectation of privacy in the home is entitled to a unique sensitivity from federal courts."[19]

The government's mainly contends that Defendant failed to make a showing that he "had any subjective expectation of privacy in the search of 3108 Seclusion Bay Drive or the items searched inside the residence."[20] Using an example, the government questions whether Defendant enjoyed an expectation of privacy in the safes found in one of the bedrooms in his home. This court's inquiry, however, is not focused on who holds title to the items seized. Rather, to challenge the warrant Defendant must demonstrate that he had an acceptable, legitimate expectation of privacy in the area the items were seized *from*.[21] With regard to that area, "the sanctity of private

---

[16] United States v. $40,955.00 in U.S. Currency, 554 F.3d 752, 756 (9th Cir. 2009).

[17] $40,955.00 in U.S. Currency, 554 F.3d 752, 756.

[18] $40,955.00 in U.S. Currency, 554 F.3d 752, 756.

[19] United States v. Reed, 572 F.2d 412, 422 (2d Cir. 1978); *accord* United States v. $40,955.00 in U.S. Currency, 554 F.3d 752, 756 (9th Cir. 2009); *see also* Groh v. Ramirez, 540 U.S. 551 (2004); Silverman v. U.S., 365 U.S. 505 (1961); Kyllo v. United States, 533 U.S. 27 (2001).

[20] Dkt. 70, at 7.

[21] United States v. $40,955.00 in U.S. Currency, 554 F.3d 752, 756, ("ownership of the *good* seized does not automatically confer standing on a defendant . . . [but] ownership and possession of as well as access to the *area* in which the good was found is certainly an important factor in determining whether a defendant has a legitimate expectation of privacy in it." (emphases in original); *see also* Alderman v. United States, 394 U.S. 165, 176–77 (1969).

dwellings [is] ordinarily afforded the most stringent Fourth Amendment protection."[22] In general, "uncontested declarations of ownership and occupancy establish[] their expectations of privacy in the entire home."[23] While Defendant did not own the house at 3108 Seclusion Bay, he did occupy the house as his home and pay rent for the same, thereby triggering the same Fourth Amendment principles.[24] Of course, "[t]he Fourth Amendment shields not only actual owners, but also anyone with sufficient possessory rights over the property searched."[25] Protections are triggered when an individual has joint control of a place as evidenced by, for example, an ongoing formal agreement, payment of rent or bills, and use of the place for its agreed upon purpose.[26]

The government relies upon U.S. v. Thomas to support its argument regarding a defendant's ownership interest and expectation of privacy.[27] Thomas is distinguished for several reasons. First, Thomas involved an automobile where "less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office."[28] Relevant in our case is that the Thomas court acknowledged the standard for residential tenants.[29] Thomas found its defendant possessed Fourth Amendment

---

[22] United States v. Martinez-Fuerte, 428 U.S. 543, 561 (1976).

[23] $40,955.00 in U.S. Currency, 554 F.3d 752, 757.

[24] *See* Georgia v. Randolph, 547 U.S. 103, 123–24 (2006) ("At least since 1604 it has been settled that in the absence of exigent circumstances, a government agent has no right to enter a "house" or "castle" unless authorized to do so by a valid warrant. See *Semayne's Case,* 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K.B.). Every occupant of the home has a right-protected by the common law for centuries and by the Fourth Amendment since 1791 – to refuse entry.").

[25] Lyall v. City of Los Angeles, 807 F.3d 1178, 1186 (9th Cir. 2015).

[26] *See* United States v. Reyes-Bosque, 596 F.3d 1017, 1028 (9th Cir. 2010).

[27] Government Opposition, Dkt. 82, at 8.

[28] United States v. Albers, 136 F.3d 670, 672–73 (9th Cir. 1998), *as amended on denial of reh'g* (Mar. 20, 1998); *quoting* South Dakota v. Opperman, 428 U.S. 364, 367 (1976).

[29] Thomas at 1198.

standing based on him having all the tenets of ownership and control: permission to use the space, a key for the space, belongings therein, and the ability to exclude others from the space.[30] Second, the government conflates the *objects* of the search with the *area* the search was conducted within. The Thomas court was not asking who had an ownership interest in the heroin in the trunk of Thomas's car, rather its search for a rule was centered on who had the ownership interest in the car, itself – the *place* searched.[31] Analogously, this court's inquiry is not of the items seized from within Defendant's house, but instead of the ownership interest Defendant had in the house, itself.

There is no dispute among the parties that 3108 Seclusion Bay Drive was the Defendant's home. All of the evidence seized as a result of the search of the home was found in Defendant's bedroom, his wife's purse, or the master bathroom.[32] The court need not and therefore does not make a finding as to whether or to what extent the Defendant owned the items found. The reasonableness inquiry here is "influenced by property law but not controlled by its rules."[33] Defendant enjoyed a societally-accepted and reasonable expectation of privacy in his home. Therefore, he may bring a challenge to the warrant which yielded evidence seized from within his home and is now being used against him.[34]

---

[30] Thomas at 1198. (citing Jones v. United States, 362 U.S. 257 (1960)). *See also* Minnesota v. Carter, 525 U.S. 83 (1998) (expounding that while the broader "automatic standing" principle in Jones was expressly overruled in Rakas v. U.S., the substantive inquiry and holding in Jones remain valid).

[31] Thomas at 1197.

[32] Dkt. 87, at 2.

[33] Georgia v. Randolph, 547 U.S. 103, 103 (2006).

[34] Alderman v. United States, 394 U.S. 165, ("If the police make an unwarranted search of a house and seize tangible property belonging to third parties . . . the homeowner may object to its use against him, not because he had any interest in the seized items as "effects" protected by the Fourth Amendment, but because they were the fruits of an unauthorized search of his house, which is itself expressly protected by the Fourth Amendment.") (A tenant in possession of the premises enjoys the same legitimate expectation of privacy as a homeowner in possession. *See,*

### b. The Alaska magistrate judge had ample evidence to find probable cause to issue the warrant for 3108 Seclusion Bay Drive.

The state magistrate judge's "determination [of probable cause] should be paid great deference" by this court when reviewing her determination for error.[35] As a court sitting in review, the narrow scope of the inquiry is "simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."[36] In looking for that substantial basis, this court reviews the totality of the circumstances as they were presented to the magistrate prior to her issuing the warrant.[37] Further, "opinions and conclusions of an experienced agent regarding a set of facts are properly a factor in the probable cause equation under the *Gates* totality of the circumstances approach."[38]

Detective Adair presented the magistrate with several facets of his investigation for her consideration. First, Detective Adair noted the observations of police and corroboration by a neighbor of frequent, strange, short-duration foot traffic to the Larkspur house. Himself having purchased heroin from Smith thru a dealer, Adair was certainly aware that Smith was involved with heroin. Adair's opinions and conclusions regarding the unusual foot traffic to the defendant's and Smith's house were well grounded in his training and experience generally and his firsthand

---

*e.g.,* U.S. v. Murphy, 516 F.3d 1117, 1122 (9th Cir. 2008); United States v. Reyes-Bosque, 596 F.3d 1017 (9th Cir. 2010).).

[35] United States v. Kelley, 482 F.3d 1047, 1050 (9th Cir. 2007) ("Normally, we do not "flyspeck" the affidavit supporting a search warrant through de novo review; rather, the magistrate judge's determination should be paid great deference.") (citing Illinois v. Gates, 462 U.S. at 236, (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969))).

[36] United States v. Seybold, 726 F.2d 502, 503 (9th Cir. 1984) (citing United States v. Ventresca, 380 U.S. 102 (1965).).

[37] United States v. Michaelian, 803 F.2d 1042, 1045 (9th Cir. 1986) (citing Illinois v. Gates, 462 U.S. 213, 236 (1983).). *See also* United States v. Burnes, 816 F.2d 1354, 1357 (9th Cir. 1987)

[38] Michaelian, 803 F.2d 1042, 1045.

knowledge of Smith's recent involvement with heroin specifically. These conclusions also included Detective Adair's assessment of the defendant's counter-surveillance behaviors as, when considered with all of the other suspicious behaviors, consistent with drug trafficking operations. Finally, the magistrate was made aware of the extremely frequent visits the defendant was making to a storage locker, several times carrying large safes into and out of the locker. On at least one of those visits he was accompanied by Smith, and on another occasion the defendant had just returned home from the locker when Smith left the house to conduct several short-duration meetings around town.

    The majority of activity in the warrant took place in short succession. Other than the historical background section, the entire chronology of events indicating probable cause described in the affidavit took place over approximately two months. The warrant for 3108 Seclusion Bay Drive was issued approximately one month after Judge Dickson had already issued a warrant for 5422 Larkspur. While Defendant and Smith had only resided at 3108 Seclusion Bay Drive for about six days prior to the warrant issuing for that location, so the magistrate was well informed of the activities of Smith and Defendant preceding the first move.    The affidavit also informed the magistrate of the background of the Defendant and Smith so that she had a full grasp of the totality of the circumstances. Approximately six months prior to the warrant's issuance, over three-hundred grams of heroin were found in Smith's apartment and on the person of his girlfriend who lived with him. Likewise, Detective Adair was also familiar with Defendant prior to this investigation. He had information from cooperating witnesses and other investigative entities within Anchorage indicating that Defendant was involved in upper level heroin sales. While this information may not stand on its own as substantial bases for probable cause, such information was provided to the magistrate as additional contextual information for consideration.

Defendant argues that during the time period from February to March, 2016 there were insufficient bases to conclude that Smith lived at 3108 Seclusion Bay Drive, and Smith had not been directly observed again supplying Detective Adair's dealer with heroin which the court will address in turn.

Defendant agrees that Smith resided with the Flowers' on Larkspur, but argues there was insufficient evidence that Smith moved with the family to 3108 Seclusion Bay Drive. Defendant argues that the observation by law enforcement on March 18th of Defendant "and others" moving items from Best Storage to Seclusion Bay was not dispositive.[39] However, the identity of the other individuals is relevant, especially considering Davon Smith was among the individuals with Defendant moving items to Seclusion Bay. Over the course of the next five days, as Detective Adair avers to the magistrate in his affidavit, the ongoing physical and electronic surveillance of Defendant, Smith, their vehicles, and 3108 Seclusion Bay Drive led him to conclude that both Smith and Defendant indeed resided at the new address on Seclusion Bay Drive.

Detective Adair further explained that the visual and electronic surveillance, which had been ongoing for many weeks, led him to conclude that Smith was residing at 3108 Seclusion Bay. While Detective Adair only provided one day's in-depth chronology of Smith at Seclusion Bay, Smith had just moved to Seclusion Bay and the activities of that day were especially relevant to the probable cause determination. Indeed, Smith was observed leaving 3108 Seclusion Bay Drive moments after the Defendant arrived home from the suspect storage locker, driving to four different locations in and around Anchorage, stopping for a few to several minutes, and at least twice engaging in a short duration meeting with others. Based on Detective Adair's training and

---

[39] Dkt. 53, at 7.

experience, the magistrate was properly informed of Adair's opinions regarding Smith's ongoing behaviors.[40]

Moreover, Adair noted that Smith both departed and returned for the night to 3108 Seclusion Bay Drive following his itinerary of short duration stops around Anchorage. Smith and Defendant had only moved to Seclusion Bay four days earlier. The magistrate's reliance on Detective Adair's conclusion that, based on physical and electronic surveillance, Smith was residing at 3108 Seclusion Bay Drive, was properly part of her assessment of the totality of the circumstances.

The court notes that Smith was not observed directly selling heroin in the month prior to the warrant's issuance. However, the magistrate was properly presented with that fact as part of her probable cause inquiry. She was additionally made aware of the various activities police observed of Smith since his last heroin sale to Detective Adair, via Adair's dealer. Indeed, it is not as if police were unaware of Smith's whereabouts during this period of time. To the contrary, the police informed the magistrate of, among other things, the dealer's communication to Adair that Smith was in the process of resupplying with heroin. That same day, police observed Smith with the defendant on the fourth floor of Best Storage. The next day, Smith was observed departing on his several short duration trips around town just moments after Defendant again arrived home from another visit to Best Storage. The unusually frequent visits by Flowers II to his storage unit at odd hours are not read in isolation. On at least five occasions police observed Defendant and his helpers hauling large safes to and from locker number 4045, with three of those occasions occurring the week the warrant in question was executed. Defendant was observed removing cash from one of

---

[40] Detective Adair also recalled the two undercover heroin purchases where Adair directly observed Smith making short duration visits to Adair's known dealer.

the safes in one of those instances. Detective Adair concluded that all of these behaviors taken together were consistent with behaviors of drug traffickers. The magistrate's reliance on Adair's opinions and conclusions in these regards was properly part of her review of the totality of all of the circumstances, as they were well chronicled in his affidavit for her consideration.

Considering the length, detail, and multi-faceted nature of the information in Detective Adair's affidavit, the magistrate was presented with the totality of the circumstances as they existed at the time. While it could be true that no one piece of information provided therein rose to the level of creating probable cause, the many various pieces of the investigation were before the magistrate for her consideration. This court's review is not one that searches for a de novo probable cause determination. Rather, this court simply looks to see if there was some basis for the original determination and whether that basis was substantial. The court finds that there was a substantial basis for the magistrate to find probable cause of illegal activity related to 3108 Seclusion Bay Drive when she issued the warrant.

    c.    **<u>The good faith exception would apply to the warrant.</u>**

The United States also argues that, if the warrant was invalid, suppression would be improper under the doctrine of good faith. Defendant disagrees. The court finds that the warrant was valid when issued, but even if it was not valid, suppression would be inappropriate the officers acted in good faith when applying for and then relying upon it.

The Supreme Court and the Ninth Circuit have acknowledged that in the case of a later invalidated warrant, suppression is improper if officers acted in good faith with "objectively reasonable reliance" on the warrant.[41] The totality of the circumstances will be assessed in determining good faith, but four *per se* exceptions-to-the-exception have been laid down.

---

[41] United States v. Underwood, 725 F.3d 1076, 1085 (9th Cir. 2013).

16

> (1) where the affiant recklessly or knowingly placed false information in the affidavit that misled the issuing judge; (2) where the judge wholly abandons his or her judicial role; (3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.[42]

Defendant argues that the first exception applies, contending Detective Adair put forth false information in two instances which mislead the magistrate. Defendant argues that Adair's affidavit falsely described Defendant's trips to and from a storage locker with large safes, at odd hours, as being "routine." Second, Defendant contends that Adair failed to inform the magistrate that the Defendant's wife was Smith's court-appointed custodian requiring Smith reside with the Flowers. Both allegations fail to disestablish good faith.

As to the first contention about trips to the storage unit with safes, the court notes the Defendant carried large safes on at least five occasions to and/or from locker #4045 within a short time frame in which he had indicated he was resupplying. Other adverbs such as "frequently" or "often" may also have applied, but semantical quibbling over the use of "routinely" instead of other adverbs is particularly the flyspecking of an affidavit our Ninth Circuit disfavors.[43] Even if Detective Adair's description was false, it was not false recklessly or knowingly. At most, the affidavit used an imprecise word to describe an indisputedly frequent visitation to the storage unit.[44] Finally, in any event, the terminal element is lacking: the magistrate was not misled. She

---

[42] Underwood, 725 F.3d at 1085.

[43] See FN. 29.

[44] *See* Franks, 438 U.S. at 171; *see also* United States v. Miller, 753 F.2d 1475, 1478 (9th Cir. 1985) (holding that the defendant failed to establish that federal agents exhibited a reckless disregard for the truth in their search warrant affidavit when it alleged that the agents failed to check the criminal background of the informant—such allegations amount to no more than negligence).

was presented with detailed, sometimes redundant, information with which she could determine the characterization of the frequency of Defendant's visits to the storage locker.

With regard to Detective Adair's omission that Smith was residing with the Flowers' pursuant to a court order stemming from his other pending drug case, that omission was immaterial. While omissions are reviewable under the same principle as false statements,[45] on review they must be material so as to remove probable cause before a warrant will be invalidated.[46] The addition of this fact does little to contradict the magistrate's finding of probable cause related to 3108 Seclusion Bay Drive when she issued the warrant as described at length above.

### Conclusion

The defendant asked the court to suppress all evidence derived from search state search warrant #3AN-16-824, which authorized the search of 3108 Seclusion Bay Drive in Anchorage, Alaska. For the reasons stated above, this motion to suppress evidence should be DENIED.

IT IS SO RECOMMENDED.

DATED this 22nd day of September 2016 at Fairbanks, Alaska.

    s/ SCOTT A. ORAVEC
SCOTT A. ORAVEC
United States Magistrate Judge

---

[45] United States v. Stanert, 762 F.2d 775, 781 (9th Cir. 1985).
[46] See United States v. Ippolito, 774 F.2d 1482, 1485 (9th Cir. 1985).