# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:16-cr-00035-SLG-SAO |
| | ) | Case No. 3:16-cr-00058-SLG-SAO |
| Plaintiff, | ) | |
| | ) | **REPORT AND** |
| vs. | ) | **RECOMMENDATION REGARDING** |
| | ) | **DEFENSE MOTION TO SUPPRESS** |
| ARNOLD WESLEY FLOWERS, II, | ) | **STATEMENTS OF THE DEFENDANT** |
| | ) | |
| | ) | **Dkt. 45 in 3:16-cr-00035-SLG-SAO** |
| Defendant. | ) | (**Dkt. 48 in 3:16-cr-00058-SLG-SAO**)[1] |
| | ) | |

## INTRODUCTION

Defendant moved for an order suppressing his statements made to law enforcement personnel pursuant to execution of a search warrant at 3108 Seclusion Bay Drive in Anchorage, Alaska on March 29, 2016.[2] Government filed an Opposition[3]; Defendant replied.[4] Magistrate Judge Oravec conducted an evidentiary hearing on August 23, 2016. Upon due consideration of the arguments and evidence adduced, the Magistrate Judge recommends that the motion to suppress statements be GRANTED IN PART, DENIED IN PART and that the court adopt the findings of fact and conclusions of law stated below.

## ISSUES PRESENTED

Defendant moved to suppress his statements made to law enforcement on March 29, 2016 on the basis that Detective Adair from the Anchorage Police Department interrogated him while he was in custody prior to advising him of his Miranda rights. Government responded that Detective Adair's statements merely informed the Defendant of the entirety of the investigation so he

---

[1] Docket annotations in 3:16-cr-00058-SLG-SAO will appear in parentheses.
[2] Dkt. 45 (Dkt. 48); Memorandum in Support of Motion to Suppress Statements at Dkt. 46 (Dkt. 49).
[3] Dkt. 67 (Dkt. 78).
[4] Dkt. 88 (Dkt. 100).

could make an informed decision whether or not to waive his Miranda rights and that Defendant's statements were made spontaneously. Government also argued Detective Adair would have read the Defendant his rights sooner, if the Defendant had not interrupted several times. The court conducted an evidentiary hearing on August 23, 2016 and Detective Adair testified for the Government.[5] The court considered a recording of the discussion between Detective Adair and the Defendant on March 29, 2016 and a partial unofficial transcript covering approximately eleven minutes of the same contact.[6]

## FINDINGS OF FACT

In case 3:16-cr-00035-SLG-SAO, Defendant was indicted on one count of Possession of a Controlled Substance with Intent to Distribute violating 21 U.S.C. § 841(a)(1) and (b)(1)(C), one count of Possession of a Firearm in Furtherance of Drug Trafficking violating 18 U.S.C. § 924(c)(1)(A)(i), and one count of Felon in Possession of Firearms violating 18 U.S.C. 922(g)(1) and 924(a)(2).[7] In case 3:16-cr-00058-SLG-SAO, a First Superseding Indictment named Defendant and Miranda May Flowers in fourteen counts of Wire Fraud in violation of 18 U.S.C. 1343.[8]

The Anchorage Police Department conducted a drug investigation beginning in approximately January of 2016. Detective Adair began the investigation with an undercover purchase of heroin from Davon Smith. After the purchase, Detective Adair examined Davon Smith's associates and residences. He determined Davon Smith resided at 5422 Larkspur Road in Anchorage Alaska in February 2016 until he moved to another residence at 3108 Seclusion Bay Drive in mid-

---

[5] Minutes of the evidentiary hearing at Dkt. 114 (Dkt. 136); Transcript of evidentiary hearing at Dkt. 118 (Dkt. 140).
[6] Plaintiff's Exhibit 1 (Recording) and Defense Exhibit A (Unofficial partial transcript).
[7] Dkt. 2.
[8] (Dkt. 132).

March 2016.  At both locations, Miranda May Flowers (Defendant's spouse), Arnold Wesley Flowers II (Defendant), and Arnold Wesley Flowers III (Defendant's son) resided with Davon Smith.[9]  Law enforcement conducted additional controlled buys and surveillance, then obtained a search warrant from an Alaska magistrate judge.

On March 29, 2016, Anchorage Police Department executed a search warrant at 3108 Seclusion Bay Drive for controlled substances, drug paraphernalia, items related to illegal transactions; items showing ownership, possession, control of such items; money; and firearms.  The Anchorage Police Department's SWAT team, along with Detective Adair, entered the residence and removed Defendant from the home.  With the Defendant in handcuffs, Detective Adair took custody of him and escorted him to his unmarked police vehicle, parked on the other side of the street, for an interview.[10]  Detective Adair escorted Defendant to his vehicle to put him in his vehicle where it was warmer than outside.

While walking, Detective Adair told the Defendant "I hope you weren't in the bathroom flushing what I think you were flushing…" to which Defendant responded "What am I supposed to be flushing ?" or words to that effect. [11]  Detective Adair responded "I'm just saying..."  Once near Detective Adair's vehicle, Detective Adair pat-searched the Defendant.  Defendant asked Detective Adair "what is this about ?" during the pat search.  Detective Adair responded by asking

---

[9] Arnold Wesley Flowers III, Defendant's son is also referred to as "Wesley Jr." by Detective Adair.

[10] Detective Adair drove a 2008-2009 Toyota Tundra, crew cab, pickup truck on March 29, 2016.  Detective Adair recorded his interaction with Defendant, Plaintiff's Exhibit 1.  Detective Adair did not have an arrest warrant for the Defendant and he was not planning on arresting him that day.  It was predetermined that Detective Adair was going to detain the Defendant and attempt to interview him.

[11] Plaintiff's Exhibit 1 is Detective Adair's actual recording (approximately 1 hour and 22 minutes) of his time at 3108 Seclusion Bay Drive.  Defendant's Exhibit A is an unofficial transcript of the recording from 9m 35s until 20m 25s.  This finding of fact will summarize and quote as necessary.

Defendant if anyone else was in the house and in particular if Davon Smith was there. Defendant denied that Davon Smith was present. Detective Adair removed Defendant's wallet from his person during the pat search, identified the currency, and placed the loose currency found on the Defendant on the dashboard. With Defendant seated in the front passenger seat, Detective Adair moved his vehicle a short distance.

Once Detective Adair parked, he identified himself as Anchorage Police Department and told Defendant he was working with the FBI and another task force to execute a warrant at Defendant's residence of 3108 Seclusion Bay Drive for the items listed in the warrant including anybody on the premises searched.[12] Defendant interrupted and asked, "Okay, but what is that for ?." Detective Adair continued to read "…for evidence for a particular crime involving misconduct controlled substance second degree and misconduct involving weapons, tends to show Davon Lynn Smith and/or his associates…" Defendant interrupted and stated "No, that's, we're not his associates." Detective Adair stated "…Okay, his family…" Defendant declared 'You know that." Detective Adair quickly responded, "I do" and then stated "let me explain to you what I know and then we'll go over things."[13]

Detective Adair paused and stated "we're holding your locker at Best Storage, we're going to get a warrant for that, I've had cameras up there the whole time you coming and going … you coming and going from that, the safe's full of money we know what's going on, I'm trying to figure out, is it just you or is it your son ?".[14] Defendant stated "Hold on, time out," but Detective Adair told the Defendant to "hold on, hear me out then we'll talk, what I'm trying to figure out is,

---

[12] Defendant remained in handcuffs in the front seat of Detective Adair's vehicle at the direction of Detective Adair during this time.
[13] Defense Ex. A, Plaintiff Ex., approximately from 11m 50s to 12m 28s.
[14] Excerpts taken directly from Defense Ex. A.

4

is your boy Wesley Jr… Is he involved ? Cause he sold drugs to…" Defendant tried to interrupt by stating "Time out," but Detective Adair continued "…hold, hear me out dude, I'll tell you what I'm here for… I know Davon's involved because he sold us dope, that's why we are here, we were gonna hit your place when you were over at Larkspur…"[15]

Detective Adair told the Defendant to "hold on" then he continued "…like you were getting shot up over there about a week before we were planning to hit you over there…" Defendant replied "Okay, that's fine." Detective Adair told the Defendant he suspected something will be inside the storage lockers. Detective Adair continued that he knew the Defendant's business, Executive Timepieces, was not a legitimate business and that he knew the Defendant and others were involved. The Defendant responded that he and his son were not in business together and his son was only staying at his house because his son and his girlfriend got into trouble.[16]

Detective Adair began in an urgent tone that "…I guess one of my main concerns was getting into that locker, you were right there at 3:00am with that little one ... Miranda's son." Defendant tried to interrupt, but Detective Adair continued "hold on, hear me out." Detective Adair stated, in an escalating tone, "You were in there at 3am with the little one, I'm like why in fuck would you bring that little one, that time a night to that locker to do your shit, if you're gonna do your shit." Defendant responded "Whoa, whoa, whoa, hold on."[17] Detective Adair told Defendant to "Hold on" and Defendant replied "Okay, go ahead." Detective Adair continued "I also know about Jamaesha and I know Jamaesha is helping you out there, the locker, hold on dude, that kind of what we're here for right now…" Defendant responded "Okay sir, you saying all this, but all

---

[15] Defense Ex. A, Plaintiff Ex., approximately from 12m 28s to 13m 6s.
[16] Defense Ex. A, Plaintiff Ex. 1, approximately from 13m 23s to 14m 26s.
[17] Defense Ex. A, Plaintiff Ex. 1, approximately from 14m 22s to 14m 50s.

5

your shit is backwards…" Detective Adair replied "Okay." Defendant talked about his divorce, then Detective Adair stated he knew about Defendant's problems with his wife and stated "…we know a lot more." Defendant retorted that Detective Adair was "way off course."[18]

Detective Adair interrupted the Defendant, "Maybe you can put me back on course but before we talk about that, I have to advise you of your rights, okay ?" Detective Adair paused briefly, then said "that's just part of it … you know the game…" Defendant stated "You say I need my rights but, why I need my rights for when…" After another slight pause, Detective Adair stated "Because I don't want you to say anything that may incriminate you …" Defendant interrupted and said "that's understandable" and then disclaimed relationships with Davon Smith and his son.[19]

Detective Adair said he saw Defendant pull out a "stack of cash" last week with Defendant's son nearby. Detective Adair described the stack of cash, "I'm not shitting you dude, that stack was about four inches thick… and I'm like 'damn,' so the watch business must be good…." Detective Adair paused and the Defendant responded "listen, see there you go, you're still on the same thing man…" Detective Adair asked him, "well, and that's what ?" Defendant described that he did not like banks.[20]

Detective Adair detailed that a drug detector dog, not trained on marijuana, alerted on the presence of controlled substances in the Defendant's storage locker. Detective Adair stated "whether they're (controlled substances) there or whether they've been there, I don't know, but the odor is in there." Defendant responded he did not know. Detective Adair continued "Yeah,

---

[18] Defense Ex. A, Plaintiff Ex. 1, approximately from 14m 53s to 15m 30s.
[19] Defense Ex. A, Plaintiff Ex. 1, approximately from 15m 37s to 15m 57s.
[20] Defense Ex. A, Plaintiff Ex. 1, approximately from 16m 11s to 16m 44s.

6

they were in the safes, dude, we got, not only the video we put up, but then we got all the storage video." Defendant admitted "that's fine, me going in and out of my storage" and then stated "you keep putting two people together who don't belong together."[21]

Detective Adair stated "Let me give you what the appearance is. You tell me, you don't have to say anything right now, I want to advise you of your rights, but the appearance is that you're pulling the strings and that boy in the red Mercedes and Davon in the black one, they're the ones that..." Defendant disclaimed "you got everything all mixed up... my son is in the military, that's his car." Defendant paused and Detective Adair said he thought the military would frown on what he's been doing. Defendant then denied the allegation.[22]

Detective Adair then stated that last week and he saw Vicki Kelly Defendant's residence.[23] Defendant admitted he knew Vicki Kelly, but denied the alleged contact. Detective Adair responded "Well, okay" and Defendant asked Detective Adair what he saw. Detective Adair said he was concerned because he saw Defendant's younger son with him at the time. Defendant proffered an explanation, then Detective Adair said he would be talking to Defendant's son and told Defendant "You've got yourself in a pickle here." Defendant asked in response "No, no, you know what you gonna find out ?" and Detective Adair stated "By all means…" Defendant responded by discussing his son and his business.[24]

Defendant stated "It's no appearance, the truth is the truth." Then Detective Adair stated:

> "well, we can talk about that if you want, it's totally up to you but I have to advise you of your rights, you have the right to remain silent, anything you say can and will be used against you in a court of law, you have the right to talk with a lawyer and have him present before, while you are being questioned, if you cannot afford to hire a lawyer, one will be

---

[21] Defense Ex. A, Plaintiff Ex. 1, approximately from 16m 51s to 17m 28s.
[22] Defense Ex. A, Plaintiff Ex. 1, approximately from 17m 31s to 17m 58s.
[23] Detective Adair's comments indicated he knew Vicki Kelly was involved in illegal activity.
[24] Defense Ex. A, Plaintiff Ex. 1, approximately from 17m 58s to 19m 36s.

7

appointed to represent you before any questioning if you wish one. You can decide at any time to exercise these rights and not answer any questions or make any statements. So, having those rights in mind do you want to set me straight on what I know or don't know ?"

Defendant did not interrupt or respond while being read his rights.[25]

Defendant paused, then Detective Adair said "It's up to you bud, you said I got it all wrong...how do I know I got it wrong ?" Defendant discussed his business, Executive Timepieces, in response to Detective Adair's questions. Defendant continued answering Detective Adair's questions. A couple minutes later, Detective Adair left the vehicle for approximately three minutes then returned, Detective Adair continued asking questions. Defendant responded by denying wrongdoing. Detective Adair told Defendant he would be executing the search warrant later in the day.[26]

Detective Adair continued asking questions of the Defendant who denied wrongdoing. Detective Adair told Defendant he would be looking at the toilet for evidence of illegal drugs and if he discovered any illegal drugs then criminal charges might result. Detective Adair asked the Defendant about Storage Locker #4045 and why the dog alerted on his locker. Defendant asked whether the storage company usually cleaned out the lockers in between tenants. Detective Adair continued asking about the contents of the storage locker and Defendant described the contents to Detective Adair. Defendant hesitated, then asked "What are you here for ?" and Detective Adair asked whether the items in the locker would be those reported stolen earlier.[27]

---

[25] Defense Ex. A, Plaintiff Ex. 1, approximately from 19m 40s to 20m 15s.
[26] Plaintiff Exhibit 1, beginning at approximately 20m and 22s.
[27] Plaintiff Exhibit 1.

Detective Adair and Defendant remained in the front seat while Detective Adair continued questioning Defendant regarding money in his wallet, possible drugs in the toilet, safes in his bedroom at 3108 Seclusion Bay Drive, and the search of his person. At approximately 47 minutes into the recording, the Defendant obtained his shoes and jacket and Detective Adair provided him a copy of the warrant and the phone number. While Detective Adair detained the Defendant on March 29, 2016 during the interview, he was released after speaking with Detective Adair and was not arrested or taken to jail that day.

## CONCLUSIONS OF LAW

Defendant seeks to suppress all statements he made to law enforcement on March 29, 2016, primarily those made to Detective Adair during his detention pursuant to execution of the search warrant at 3108 Seclusion Bay Drive. This court addresses the Miranda requirements of custody and interrogation, sufficiency of Miranda advisement, and admissibility of post-Miranda statements.

In Miranda v. Arizona, the United States Supreme Court held whenever a criminal suspect is subjected to custodial interrogation, he must be advised of certain rights now familiar to all, including his right to remain silent and his right to counsel.[28] When the police fail to give the required warnings, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant."[29] Miranda rights are required when two elements are present: (1) the suspect is in custody; and (2) the suspect is interrogated by law enforcement.[30] This court examined Defendant's statements to Detective Adair on March 29, 2016.

**I. Custody during Pre-Miranda interaction between Detective Adair and Defendant.**

---

[28] Miranda v. Arizona, 384 U.S. 436, 444 (1966).
[29] Miranda, 384 U.S. at 444, cited by Garcia v. Long, 808 F.3d 771, 777 (9th Cir. 2015).
[30] United States v. Bassignani, 575 F.3d 879, 883 (9th Cir. 2009).

Defendant was not arrested on March 29, 2016, however a suspect may still be deemed "in custody" for Miranda purposes in the totality of the circumstances, even when a formal arrest did not occur.[31] The ultimate inquiry underlying the question of custody "is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[32] To answer this question, the reviewing court looks to the totality of the circumstances that might "affect how a reasonable person in that position would perceive his or her freedom to leave."[33]

It is clear Defendant was "in custody" for Miranda purposes when speaking to Detective Adair even though not under arrest on March 29, 2016. The Anchorage Police Department SWAT team gave custody of Defendant to Detective Adair who then escorted Defendant to his vehicle. Throughout this contact, Defendant remained in handcuffs placed on him at the scene and his movements were restrained. Once at the vehicle, Detective Adair continued to exert control over the Defendant and restrain his movement by conducting a 'pat-search' and then placing him in the passenger seat of his vehicle. Detective Adair briefly relocated his vehicle with Defendant in it. Throughout the contact with Detective Adair, until Defendant's release, Defendant's movement was subject to the permission of Detective Adair and he remained partially clothed, until officers obtained clothes and shoes for him. Under these circumstances, there was no question Defendant was not free to leave and clearly "in custody."[34]

**II. Interrogation during Pre-Miranda interaction between Detective Adair and Defendant.**

---

[31] United States v. Craighead, 539 F.3d 1073, 1082 (9th Cir. 2008).
[32] Stansbury v. California, 511 U.S. 318, 322 (1994)( citation and alteration omitted).
[33] Stansbury, 511 U.S. at 322, 325.
[34] As the Government conceded the Defendant was in custody during his contact and interaction with Detective Adair, Dkt. 67 at 5, and the circumstances are clear, this court does not find further need to address it further.

This court examines whether Detective Adair's discussion with Defendant constitutes "interrogation" by law enforcement. To determine whether an "interrogation" has occurred within the meaning of Miranda, the court analyzes whether, under all the circumstances, the suspect was subjected to questioning that was "reasonably likely to elicit an incriminating response."[35]

Many of Detective Adair's statements to the Defendant were reasonably likely to elicit an incriminating response. The court is not limited to looking at the questions themselves, but can consider the reason the defendant is in custody and the nature of the questions when analyzing whether the questions were "reasonably likely to elicit an incriminating response."[36] Detective Adair knew the Defendant was in custody because of the search warrant executed at his house for evidence of misconduct involving controlled substances and other wrongdoing. The manner of Detective Adair's comments bears this out: the nature of the questioning about Defendant's son; the same question asked repeatedly in a different fashion and the format of the questions which presumed guilt (i.e. "Is it just you or is it your son ?). The manner of questioning is more consistent with that of a post-Miranda interrogation.

Defendant's comments between 9 minutes 51 seconds until 19 minutes and 43 seconds reflect an interchange of information reasonably likely to elicit a response. Several examples are analyzed here.

Detective "I hope you weren't in the bathroom flushing what I think you were flushing…" Since Defendant was detained during the service of a warrant for controlled substances, the accusation was clear. Detective Adair accused Defendant of possessing and attempting to destroy controlled substances. A statement of this nature would invite a response from a reasonable person.

---

[35] Rhode Island v. Innis, 446 U.S. 291, 301 (1980).
[36] United States v. Salgado, 292 F.3d 1169, 1172 (9th Cir. 2002); Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

11

Be it affirmation, denial, or request for clarification and further discussion, any response by the defendant would indicate a *mens rea* regarding controlled substances and other criminal offenses. After Defendant responded seriously "What am I supposed to be flushing ?" Detective Adair tried to lighten the mood by commenting "I'm just sayin', bud..." However, this second comment does not mitigate the first.

After pat-searching the Defendant, Detective Adair if anyone else was in the house, in particular Davon Smith, a known drug dealer. The question invited a response; be it affirmation, denial, or further discussion where again a response is reasonably likely to incriminate the Defendant.

Following the passages read directly from the warrant, Detective Adair's additional statements were again reasonably likely to elicit incriminating statements from the Defendant. After Detective Adair moved his vehicle with Defendant in the front seat, Detective Adair continued addressing the Defendant. He identified himself and read passages regarding location and scope directly from the warrant. Defendant asked "what this was for ?" and Detective Adair read directly from the warrant, passages regarding evidence sought. The Defendant interrupted and corrected Detective Adair that he was not an associate of Davon Smith's, then Detective Adair responded "Okay... His family..." Defendant declared "you know that" and Detective Adair declared he did. This exchange was reasonably likely to elicit an incriminating response.

In the totality of the circumstances, Detective Adair's discussion with Defendant was reasonably likely to elicit a response, Detective Adair initiated discussion, indicated he would "explain to you what I know and then we'll go over things," some of the evidence held by law enforcement like incriminating videos, etc. and described further investigative activity. The Government excuses such statements, arguing Detective Adair "informed the Defendant of the reason the

Anchorage Police were at his residence and a brief outline of the investigation…" so he could make a fully informed decision regarding whether to waive his rights.[37] Although that may be said about plain statements of information, in this instance, the interchange closed with Detective Adair asking a question such as "I'm trying to figure out, is it just you or is it your son ?" to which the Defendant responded. Most telling is that when Detective Adair continued to identify the evidence already assembled, Defendant attempted to interrupt and asked for a "time out." Detective Adair continued describing his perception of the criminal activity and Defendant's involvement and transitioned to questioning the legitimacy of Defendant's business, Executive Timepieces. Yet again, the statements ended with questions, again Defendant interjected, this time describing his business and his relationship with his son.

Government analogized Detective Adair's questions to those in Pennsylvania v. Muniz regarding a suspects name, address, height, weight, eye color, date of birth, and current age to Detective Adair's questions of the Defendant.[38] Detective Adair's questions to the Defendant were not akin to the biographical questions of Muniz, but were "words or actions on the part of the police…that the police should know are reasonably likely to elicit an incriminating response from the suspect."[39] Detective Adair's questions included "I hope you weren't in the bathroom flushing what I think you were flushing…", "Is it just you or is your son involved as well ?" and "why in the fuck would you bring that little one, that time a night to that locker to do your shit, if you're gonna do your shit ?" The questions Detective Adair asked were designed to aid in that investigation by further defining the scope of the illegal activity including his associates and sources of income. Detective Adair even questioned Defendant's related activities, including his business.

---

[37] Government Opposition to Defendant's Motion to Suppress Statements of the Defendant.
[38] Government Opposition at 5, Pennsylvania v. Muniz, 496 U.S. 582, 600 (1990).
[39] Pennsylvania v. Muniz, 496 U.S. 582, 600-601. (1990).

The questions in Muniz are not nearly as benign as the questions found exempt from Miranda requirements.

Government also argues that Defendant's statements with Detective Adair are admissible as spontaneous "volunteered statements."[40] The court recognizes that "volunteered statements" made spontaneously, not in response to questions by agents, are admissible.[41] However, "volunteered statements" are those which are not prompted by law enforcement inquiries, and as discussed previously, Detective Adair's statements tended to ask a question rather than declare a statement. When Detective Adair described inculpatory evidence against the Defendant, then asked the Defendant questions regarding the evidence, he should have known those were reasonably likely to elicit an incriminating response. Defendant's comments were more likely in response to questions which begged a response, whether affirmation or denial, and were reasonably likely to elicit an incriminating response.

The Government also does not address that throughout the interview, Detective Adair's interview, he acknowledged the need to read the Defendant his Miranda rights but instead of doing so digressed into a discussion with the Defendant about why he needed to be read his rights. For instance, Detective Adair stated "I want to advise you of your rights, but the appearance is that you're pulling the strings[.]" Stated desire to read Miranda rights does not satisfy the requirement. Ultimately, Miranda requires that "an individual held for interrogation must be clearly informed [of his rights]."[42]

---

[40] Government Opposition at 7.
[41] United States v. Gordon, 974 F.2d 1110, 1115 (9th Cir. 1992); See also United States v. Fernandez, 134 F.3d 379 (9th Cir. 1998) (unpublished).
[42] Miranda, 384 U.S. at 471; US v. IMM, 747 F.3d 754, 769 (9th Cir. 2014).

Detective Adair read the Defendant his Miranda rights at approximately 19 minutes and 43 seconds into the recorded exchange on Plaintiff's Exhibit 1. Miranda requires four specific warnings: that the suspect has the right to remain silent; that anything he says can be used against him in a court of law; that he has the right to the presence of an attorney; and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.[43] Detective Adair's statements at 19 minutes and 43 seconds satisfied requirements under Miranda, especially considering Miranda itself indicated that no talismanic incantation was required to satisfy its strictures.[44]

Because Defendant had not been advised under Miranda, this court finds the statements made by Defendant prior to receiving the Miranda warning should be suppressed and may not be used by the prosecution as evidence in their case-in-chief.[45] Defendant's responses to Detective Adair from 9 minutes and 51 seconds on Plaintiff Exhibit 1 until Detective Adair read him his Miranda rights should be suppressed.[46] However, Defendant's statements were not made involuntarily.

### III. Defendant's Post-Miranda statements.

Detective Adair continued to question Defendant after advising him of his Miranda rights. Defendant indicated his willingness to answer and discuss the case with Detective Adair after being read his Miranda rights. Defendant did not contend that his post-warning statements were

---

[43] Miranda, 384 U.S. at 479.
[44] California v. Prysock, 453 U.S. 355, 69 L.Ed.2d 696 (1981).
[45] Miranda, 384 U.S. at 444, cited by Garcia, 808 F.3d at 777. Statements taken in violation of Miranda.
[46] Approximately 9 minutes and 51 seconds on the recording of Plaintiff's Exhibit 1 until approximately 19 minutes and 43 seconds.

involuntary or otherwise required to be suppressed.[47] From Defendant's demeanor and interaction, it was clear his statements were voluntary and not the product of a coercive environment or intimidation. Because Defendant was sufficiently apprised of his rights and Defendant's post-rights warning statements were made voluntarily, the post-warning statements are admissible.[48]

## CONCLUSION

For the foregoing reasons, the court RECOMMENDS the Defendant's Motion to Suppress Statements at Docket 49 be GRANTED IN PART, DENIED IN PART. Defendant's statements to law enforcement on March 29, 2016 made while in law enforcement's custody from 9 minutes and 51 seconds until prior to Detective Adair's Miranda advisement at approximately 19 minutes and 43 seconds into the recording, at Plaintiff's Exhibit 1, SHOULD BE SUPPRESSED. Defendant's statements made to Detective Adair or other law enforcement officers following the Miranda advisement on March 29, 2016 SHOULD NOT BE SUPPRESSED.

IT IS SO RECOMMENDED.


DATED this 23rd day of September 2016 at Fairbanks, Alaska.
              s/ SCOTT A. ORAVEC
              SCOTT A. ORAVEC
              United States Magistrate Judge

A party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court per the schedule established by the District Court Judge. The

---

[47] See United States v. Williams, 435 F.3d 1148, 1157 (9th Cir. 2006) discussing Missouri v. Seibert, 542 U.S. 600 (2003).
[48] United States v. Reyes-Bosque, 596 F.3d 1017, 1031 (9th Cir. 2010) citing United States v. Narvaez-Gomez, 489 F.3d 970, 974 (9th Cir. 2007) citing Missouri v. Seibert, 542 U.S. at 622 and Williams at 1157-1158.

parties shall otherwise comply with provisions of Local Magistrate Rule 6(a). The failure to object to a Magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal.[49] The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a Magistrate judge's recommendation.[50] Objections and responses shall not exceed **five (5) pages** in length, or as otherwise directed by the District Court Judge, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment.[51]

---

[49] McCall v. Andrus, 628 F.2d 1185, 1187-1189 (9th Cir.), cert. denied, 450 U.S. 996 (1981).
[50] United States v. Howell, 231 F.3d 615 (9th Cir. 2000).
[51] See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).